[No. 39030.    Department Two.    December 14, 1966.]

PUBLIC UTILITY DISTRICT No. 1 OF DOUGLAS COUNTY, *Petitioner,* v. CLARKE LEE COOPER *et al., Respondents.*

PUBLIC UTILITY DISTRICT No. 1 OF DOUGLAS COUNTY, *Petitioner,* v. RONALD H. MORRIS *et al., Respondents.*

PUBLIC UTILITY DISTRICT No. 1 OF DOUGLAS COUNTY, *Petitioner,* v. ALVIN EDWARD HYMER *et al., Respondents.**

*Reported in 421 P.2d 1002.

*Hughes & Jeffers* and *Harold A. Pebbles,* for petitioner.

*William B. Holst* (of *Tonkoff, Holst & Hanson*), for respondents.

WEAVER, J.—Writs of certiorari bring before us for review an order adjudicating public use and necessity entered in three cases consolidated for trial in the Superior Court of Okanogan County.

The petitioner, Public Utility District No. 1 of Douglas County, Washington, a municipal corporation (hereafter designated as PUD), holds a license for Project No. 2149, dated July 12, 1962, from the Federal Power Commission, to construct, operate and maintain the Wells Hydroelectric Project on the Columbia River. The Wells Dam is located across the Columbia River between Douglas and Chelan Counties and its reservoir floods lands in Chelan, Okanogan and Douglas Counties, including the lands owned by defendants. 16 U.S.C. § 791a., *et seq.* (1964).

In order to accomplish the purpose of its federal license, the three actions in eminent domain were commenced by the PUD to acquire the fee simple title to certain parcels of land owned by each of the various defendants.

Since an answer to a petition in eminent domain is not necessary (*State ex rel. Washington Water Power Co. v. Superior Court,* 41 Wn.2d 484, 490, 250 P.2d 536 (1952)), a landowner may urge at trial as many defenses as are supported by the law and the evidence. A plethora of contentions is presented by the assignments of error made by the PUD and the defendants, who are cross-petitioners; however, when the evidence is sifted and resifted, we find that the fundamental question is: does the PUD have the right to acquire in fee simple that portion of defendants' property necessary to accomplish its purpose under its federal license, or is the PUD limited to the acquisition of a flowage easement over defendants' property needed for the storage reservoir?

Defendants maintain that a flowage easement would fully satisfy the purpose of the license, and that the PUD is estopped from taking the fee simple title. The lands sought include the lands covered at maximum high water, plus the lands included by a "freeboard" of four vertical feet above high water. The land in the freeboard area would be affected by seepage, erosion, slipping and sloughing, and is deemed necessary in order to police and control the rim of the reservoir, remove debris, and protect against pollution, wave action and erosion.

It is beyond dispute that the PUD has the authority, both by statute (16 U.S.C. § 814 (1964); RCW 54.16.020) and under its federal license, to acquire the fee simple title to the property needed for its project.

The fundamental question presented by this review springs from the trial court's finding of fact 13:

> Most of defendants' evidence was devoted to their fourth contention, namely, estoppel. They contended that on two distinct occasions they relied, to their detriment, on petitioner's [PUD] representations that only flowage easements would be taken, except in cases of prime necessity.

> The "consideration," "altering of position," or "detrimental reliance" of defendants they contended arose out of the following facts:

> A number of persons who were members of a group named "Mid-Columbia Planners" had in 1961 filed a petition in intervention with the Federal Power Commission at a time when petitioner was seeking its license to build the Wells Dam. [Exhibit 64, Petition to Intervene, was filed with the Federal Power Commission November 18, 1957]. The petitioner [PUD], seeking to have this impediment removed, held a meeting with those persons at Winnie's Cafe in Brewster. Here defendants contend demands were met and assurances given concerning a number of things, among which fee versus flowage easement was resolved in favor of Mid-Columbia Planners.

> The then members of "Mid-Columbia Planners," being satisfied with the commitments defendants claim were made at the aforesaid meeting, withdrew their petition in intervention. The petitioner District agreed to reduce its position to writing in the form of a "letter of intent." It

did so, though, during the ensuing months *there was a period of negotiations, to and fro, inwards, outwards, and back and forth* before the final "letter of intent" (Exhibit 69) was formulated.

In more recent times it became the belief of certain persons, including the defendants, Blaine M. Madden and Blaine W. Hodgen, that the petitioner Public Utility District, would not or might not live up to its commitments as set out in the "Letter of Intent."

There then ensued a lawsuit [filed October 1, 1963] in Douglas County entitled:

Bert S. Stennes, et al.,

Plaintiffs,

v.

Public Utility District No. 1 of
Douglas County, et al.,

Defendants.

the same being Douglas County Superior Court Cause No. 8924.

In said action the plaintiffs therein sought an injunction prohibiting the sale of bonds by the Public Utility District in connection with the financing of the Wells Dam.

As a result of such suit a second meeting was held in Pateros at Wagg's Cafe. This was on the 3rd of October, 1963. There were four separate meetings held that day in which different individuals participated, all resulting in a meeting of the principals or their agents in the wee hours of the next morning. The urgency was occasioned by the fact that the bonds were scheduled for sale on the New York Market the following morning and the underwriting brokerage refused to proceed if there were any lawsuits pending.

At this meeting, once again defendants contend the fee versus easement controversy was decided in their favor. This decision, among other things, caused plaintiffs in said Stennes case to sign a stipulation agreeing to an order of dismissal (Exhibits 63 and 72), which was entered the next day, October 4, 1963, or more accurately, later on the same morning.

The defendants here contend that the surrendering of their "day in court" be it win, lose or draw by Mid-Columbia Planners in the intervention in the Federal Power Commission proceedings and by the plaintiffs in the Stennes case amounted to sufficient forbearance to create an estoppel in this case.

As to the question of whether or not the petitioner, Public Utility District, ever promised Mid-Columbia Planners or plaintiffs in the Stennes case to take flowage easements instead of a fee title *to say that the evidence is conflicting is a masterpiece of understatement. The testimony on both sides, from both lay witnesses and attorneys who were present at the critical meetings, is diametrically opposed. The testimony is wholly unreconcilable.*

*The documentary evidence favored petitioner in a negative way on the point, that is, there is a marked absence in petitions, complaints and correspondence of the fee versus easement issue.*

Whatever discussion was had at the meetings in Winnie's Cafe in Brewster and at Wagg's Cafe in Pateros was enough to convey to the participants, including the defendants, Blaine M. Madden and George Hymer (in the Mid-Columbia Planners intervention only), and Blaine W. Hodgen (in the Stennes case only), the *impression* that a commitment had been made by the Public Utility District to take by flowage easement, except in cases of prime necessity. (Italics ours.)

The record supports this finding of fact. We pass for the moment, however, a discussion of the legal effect, if any of the "impression" to which the trial court alluded in the last paragraph of finding No. 13.

In addition, the trial court found, and the record supports the finding, that the PUD commissioners had considered all pertinent data when they determined it would be in the public interest to acquire fee title[1] to the land involved as opposed to a flowage easement over the portion that would be inundated. The court found that this determination was not "arbitrary, capricious or constructively in fraud," and concluded, as a matter of law, that the determination was "final and binding upon this court."

This finding is supported by the record and the conclusion is well within the ambit of our definition of arbitrary and capricious. *Tacoma v. Welcker*, 65 Wn.2d 677, 684, 399 P.2d 330 (1965); *State ex rel. Dawes v. Highway Comm'n* 63 Wn.2d 34, 40, 385 P.2d 376 (1963), and authorities cited.

[1]Out of approximately 700 parcels of land to be acquired, the PUD has acquired fee title to 600 through direct negotiations with the owners.

Based upon finding of fact No. 13, the trial court held in its conclusion of law No. 3:

> The defendants,[2] believing that the petitioner [PUD] had committed itself to a taking by flowage easement rather than by fee title, and having twice altered their position in reliance upon such belief, are entitled to raise an estoppel as against petitioner [PUD] attempting to condemn a fee title, except in cases of prime necessity, since petitioner failed to define its position with the clarity required of a governmental body under *State ex rel. Shannon v. Sponburgh*, 66 Wn.2d 126 [135].

June 23, 1966, the court entered its Order Adjudicating Public Use and Necessity. It authorized the PUD to condemn and appropriate (a) the fee title to the lands of Earl F. and Mary L. Marsh (see note 2); and (b) the fee title to a portion of the lands of certain defendants because these tracts were of prime necessity in the relocation of a railroad. As to the remaining lands involved, the order authorized the PUD to condemn and appropriate only a flowage easement.

Thus we come to the fundamental question: Is conclusion of law No. 3 (quoted *supra*), in which the court held the PUD estopped to condemn a fee simple title, supported by finding of fact No. 13 (quoted *supra*)? Stated another way, did defendants carry the burden of proof sufficient to establish an estoppel against a municipal corporation?[3]

For a clearer understanding of the relationship between the finding of fact and the conclusion of law, we turn to

---

[2]Except defendants Earl F. Marsh and Mary L. Marsh, owners of Tracts 336.0 and 366.0A described in case No. 16839, since neither of them "were parties to the Mid-Columbia Planners intervention or to the Stennes case, nor were they transferees of any parties to said matters." Conclusion of Law 5.

[3]In view of our conclusion, we do not reach the question of whether a state court can, as a matter of law, *prevent a federal licensee* (even though a municipal corporation of the state) from exercising the federal power of eminent domain to take property necessary to the accomplishment of a public use licensed by a federal agency. See: *Tacoma v. Taxpayers*, 357 U.S. 320, 339-40, 2 L. Ed. 2d 1345, 1356, 78 Sup. Ct. 1209 (1958); *Chapman v. PUD No. 1 of Douglas Cy., Washington*, 367 F.2d 163 (9th Cir. 1966); *First Iowa Hydro-Electric Cooperative v. Federal Power Comm'n*, 328 U.S. 152, 90 L. Ed. 1143, 66 Sup. Ct. 906 (1946).

the trial judge's written memorandum opinion in which he states:

In this area [fee simple v. flowage easement], to say the evidence is conflicting is a masterpiece of understatement. The testimony on both sides, from both lay witnesses and attorneys who were present at the critical meetings, is diametrically opposed. The testimony is wholly unreconcilable *and the case wholly undecidable.* Ordinarily, therefore, on the basis of burden of proof, the Plaintiff [the context of the opinion establishes that the trial court meant "defendants"] would lose, (though, even this point was in contention).

The Court, as trier of fact, *chooses to avoid the unpleasant choice,* and also accomplish a decision of the case, in the following finding of fact and law.

Conceding that both the Plaintiff's and Defendants' hindsight is 20-20 as to what was said and promised at the Brewster and Pateros meeting, whatever discussion was had was enough to convey to the Defendants the *"impression"* that a commitment had been made.

Thus, the Court finds for the Defendants on the basis of a comment made by the Supreme Court in 66 W.D.2d 126 [66 Wn.2d 135], "The conduct of Government should always be scrupulously just in dealing with its citizens."

In making this ruling the Court concedes that the preponderance of the *documentary* [italics by trial judge] evidence favored the Plaintiff in a negative way. That is, there was a marked absence in petitions, complaints and correspondence of a "fee v. easement" issue. *The testimonial evidence was evenly matched.* (Italics ours.)

We have examined the documentary evidence referred to by the trial judge in finding of fact No. 13 and conclusion of law No. 3. We find that his evaluation of it is accurate. The absence of any reference to the question of fee simple title versus flowage easement in the documentary evidence is almost conclusive that the issue was never crystallized. This is illustrated by the following:

(a) The issue is not mentioned in the Petition to Intervene filed by Mid-Columbia Planners November 18, 1957, with the Federal Power Commission. Indicative that the issue did not exist is the intervenors' request that the PUD "be required to *purchase* and to *condemn* lands to be affected

prior to the start of the physical construction of the project." (Italics ours.)

(b) After a series of meetings, a conference was held January 9, 1962, between defendants' agent, Mr. Schulke, and the PUD manager and its lawyer to discuss the contents of a proposed "letter of intent" to be given by the PUD. A 54-page verbatim transcript of the conference is in the record. There is a significant absence of any reference to the issue of the PUD taking a flowage easement instead of fee simple title. Insofar as land acquisition is concerned, the discussion centers around negotiated sales and land valuation by comparable sales.

(c) April 25, 1962, after further negotiations, the PUD gave the Mid-Columbia Planners a "letter of intent." This is a most significant document. It poses 12 questions raised by Mid-Columbia Planners in the previous meetings and negotiations, and sets forth the PUD's answers thereto. Four of the questions and answers are directly or indirectly concerned with land acquisition by the PUD but do not mention or refer to the possibility that the PUD would confine its acquisitions to a limited easement. In answer to one question, the letter states: "This Commission cannot waive any of its legal rights pertaining to the condemnation of property."

(d) April 30, 1962, Mid-Columbia Planners filed with the Federal Power Commission a withdrawal of their petition to intervene, stating that the differences between them and the PUD "have been resolved by and through the execution of a letter of intent satisfactory to the Mid-Columbia Planners." Again, there is no mention of the alleged agreement by the PUD to take only a flowage easement over defendants' properties.

(e) October 1, 1963, a number of the members of Mid-Columbia Planners commenced an action against the PUD in the Superior Court for Douglas County entitled *Stennes v. PUD No. 1 of Douglas Cy.* Plaintiffs claimed that the PUD had breached the terms of its letter of intent dated April 25, 1962. The complaint contains no reference to flowage easements.

This action, which would have at least delayed the sale of the PUD bonds in New York, precipitated the meetings to which reference is made in finding of fact No. 13. Although defendants contend that fee simple acquisition versus flowage easements was the major subject of the meetings, it is puzzling to find no reference to this issue in the stipulation for dismissal of the action signed October 3, 1963, by all the plaintiffs. In the written stipulation between counsel the PUD reaffirms the letter of intent and agrees only

to begin negotiations for acquisition of plaintiffs' [defendants'] properties and negotiation with Junior taxing districts within sixty (60) days after District receives the proceeds from District bond issue and that Plaintiffs [defendants] will not be discriminated against on the basis of their participation of [sic] this lawsuit.

As against this documentary evidence, which we deem most persuasive, defendants present notes made by Mr. Nickell of Mid-Columbia Planners on a small sheet of scratch paper at one of the meetings between the parties. The notes indicate that "flood easements" were agreed upon. Mr. Lieberg, the PUD manager, testified that the question of "fee or easement" was discussed, but stated:

To the extent that we agreed on the discussion of certain subjects, I would say that we agreed. *We did not agree in that the District had made no commitment on this matter.* (Italics ours.)

It would unduly extend this opinion to detail the oral evidence of the trial. Witnesses for the PUD testified unequivocally that no representations were ever made to take only a flowage easement. After a thorough examination of the record, we deem it sufficient to say that we agree with the trial court: "The testimonial evidence was evenly matched."

We conclude that finding of fact No. 13 does not support conclusion of law No. 3 and the Order of Public Use and Necessity entered pursuant thereto, unless, as the court found,

the *impression* that a commitment had been made by the

Public Utility District to take by flowage easement, except in cases of prime necessity. (Italics ours.)

is sufficient to invoke the doctrine of equitable estoppel against a municipal corporation. (See note 3, *supra*).

■ The parties agree that the burden of proving an estoppel is upon the defendants. In *Heasley v. Riblet Tramway Co.*, 68 Wn.2d 927, 936, 416 P.2d 331 (1966), this court quoted from *Stouffer-Bowman, Inc. v. Webber*, 18 Wn.2d 416, 428, 139 P.2d 717 (1943), in which it is said:

Estoppels must be certain to every intent, and are not to be taken as sustained by mere argument or doubtful inference.

The *Stouffer-Bowman* opinion also states that

the doctrine of estoppel *in pais* must be applied strictly, and should not be enforced unless substantiated in every particular.

■ In the instant case we must recognize an additional rule: the doctrine of equitable estoppel is not a favored one when applied to municipal corporations acting in a governmental capacity. 31 C.J.S. *Estoppel* § 141 b.

We are concerned primarily with the *quantum* of proof necessary to establish an equitable estoppel. One text, supported by an abundance of case authority, states it thus:

The general rule established by the authorities is that the proof offered to establish an estoppel must be certain in every particular, with nothing left to mere intendment or inference. It has been variously stated that to prove an estoppel, the evidence must be clear; convincing; clear and convincing; clear and satisfactory; convincing and satisfactory; clear, satisfactory, and convincing; clear and unequivocal, or clear, precise, and unequivocal; positive and unequivocal; clear and definite; clear and plain; clear and distinct; clear, distinct, and satisfactory; unusually clear; very clear and cogent; and extremely clear and convincing. It has also been stated that strict proof is required to establish an estoppel, and that to constitute an estoppel, conduct must be clearly established by a preponderance of the evidence. 28 Am. Jur. 2d *Estoppel and Waiver* § 148.

■ With all of the vital documentary evidence negating

defendants' contention of estoppel, and "the testimonial evidence . . . evenly matched," an "impression" is not sufficient to satisfy the quantum of proof necessary to estop a municipal corporation. (This conclusion is independent of the question of law suggested in note 3, *supra.*)

*State ex rel. Shannon v. Sponburgh,* 66 Wn.2d 135, 401 P.2d 635 (1965), upon which the trial court and defendants place great emphasis, is not apposite.[4] No question of fact was involved. The State Liquor Control Board had granted an application to change the location of a tavern. Relying upon the grant, the applicant spent his life savings remodeling new premises. The Board later withdrew its commitment and denied the application for change of location. The doctrine of equitable estoppel was correctly applied. *Sponburgh* did not involve a question of the quantum of proof necessary to prove an estoppel against a state agency or a municipal corporation.

We turn briefly to the remaining issues presented by defendants' assignments of error.

Defendants' contentions are these: (1) the PUD is taking lands for recreational use; (2) the PUD did not consider the effect of Canadian projects upon the flow of the Columbia River which will prevent future floods and tend to lower the extreme high water level of the reservoir; (3) the PUD does not have the right to take the fee title of lands owned by Earl F. and Mary L. Marsh in order to fulfill its contract in aid of the relocation of the town of Pateros; and (4) the survey of the project is inadequate, defective and improper.

It would add nothing to this opinion to analyze each contention in detail. The findings and conclusions of the trial court dispose of the first three of the contentions adversely to the defendants.

The findings and conclusions are supported by (a) the record; (b) the PUD's statutory authority; (c) the federal

[4]The writer of the present opinion wrote the dissent in *Sponburgh,* based, not upon a disagreement with the doctrine of equitable estoppel, but upon the grounds that the courts did not have jurisdiction of the subject matter.

license for Project No. 2149 of the Federal Power Commission; (d) the joint policy statements of the Department of the Interior and Corps of Army Engineers concerning land acquisition for federal reservoir projects; and (e) Order 313 dated December 27, 1965 of the Federal Power Commission.

Either by design or inadvertence, the court's findings of fact and conclusions of law do not pass upon defendant's fourth contention, *supra*—the alleged inadequacy and defectiveness of the survey of the project.

During trial, however, the trial judge ruled that defendants' "showing made was too inconclusive and nebulous"; and

> that there was no showing that any difference in land area or difference in value would be anything but minimal if a resurvey were had and that it would be unnecessary for the plaintiffs to rebut this phase in rebuttal.

We find no error in the ruling of the trial court.

In summary:

The Order Adjudicating Public Use and Necessity dated June 23, 1966 is reversed insofar as it limits the Public Utility District No. 1 of Douglas County, Washington to the acquisition of flowage easements over the properties of defendants; in all other respects the order is affirmed.

The consolidated cases are remanded to the trial court with instructions to enter an Amended Order Adjudicating Public Use and Necessity authorizing the Public Utility District No. 1 of Douglas County, Washington to condemn and appropriate fee title to the lands involved.

It is so ordered.

DONWORTH, FINLEY, and HAMILTON, JJ., and POYHONEN, J. Pro Tem., concur.

---

March 8, 1967. Petition for rehearing denied.